Melvin JOHNSON, Plaintiff,

v.

MODERN WELDING COMPANY,
Defendant.

No. CV180–89.

United States District Court,
Southern Dist. Georgia,
Augusta Division.

May 23, 1981.

John D. Watkins, Augusta, Ga., for plaintiff.

Allen W. Johnson, Augusta, Ga., for defendant.

## MEMORANDUM OF OPINION AND ORDER

BOWEN, District Judge.

On May 19, 1980, plaintiff Melvin Johnson filed suit against defendant Modern Welding Company under the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* After discovery and pretrial proceedings, the case was tried to the Court on April 29, 1981, at Augusta, Georgia.

### THE FACTS

Modern Welding Company is a corporation which operates a metal fabrication plant in Richmond County, Georgia. It produces welded steel tanks and pressure vessels of various sizes. A substantial part of the company's production is large, underground, low-pressure cylindrical steel tanks which are produced by the "underground" department. Steel pressure vessels (high pressure tanks) are produced in its "specialty" department. The company usually employs approximately fifty people in its Augusta plant. Modern Welding Company has other plants throughout the country and appears committed to the manufacture of high-quality, often expensive, products.

Defendant employs a substantial number of black people in the "underground department" and in the "specialty department" where only highly-skilled, certified welders work. None of the "front office" personnel are black.

Plaintiff's brother William works as a certified welder for Modern Welding Company where he enjoys the reputation of a regular and satisfactory employee. William

Johnson referred the plaintiff to Modern when he was looking for work after having been laid off at Owens-Corning. Having been referred by his brother and having applied for an available position, plaintiff was hired by Modern on December 12, 1977. His employment began as a trainee, and he was paid $4.25 per hour. Plaintiff's first efforts as a trainee were apparently successful. He received a pay increase and several cost of living pay increases. Plaintiff was trained in several positions. Some of the time he worked under his brother William. Plaintiff worked as a tack welder, a tank tester, a roll operator, and as operator of a twin arc welding machine.

Melvin Johnson is a well-spoken, intelligent man who appears pleasant and personable in Court. There are indications, however, that he did not get along so well with his immediate supervisor, Mr. Roy Meese.

Roy Meese has been with Modern Welding Company since the early phases of its Augusta, Georgia, operations. He is the supervisor, or foreman, in the underground department. Virtually everyone in the plant, including the plaintiff, calls him by his first name. Mr. Meese appears to have skill and experience in the trade where he is employed. He is no stranger to physical exertion and the other demands of his industry. Meese is not given over to unnecessary conversation, laudatory or otherwise. Neither does he have a history of making plant decisions on the basis of race. Mr. Meese works with blacks and whites alike. On occasion, he has referred blacks whom he has known in other jobs for employment at Modern Welding Company. One such person testified for the plaintiff in this case.

There were few complaints about plaintiff's performance as a tack welder and roll operator. There was some dissatisfaction about his performance as a tank tester, and he was placed on the twin arc welding

machine. Curiously, in an effort to find a place where plaintiff would be suitable for permanent employment, he was moved from positions of lesser to greater skill requirements.

The plaintiff contends that he was advanced through several demanding positions and placed on the twin arc welding machine so that he could be fired for his lack of skill there. Plaintiff has testified that he was directed to speed up the twin arc welding machine and run it for extended periods at high speed (45 inches per minute) so that he would make a bad showing and be fired. He also contends that another white employee who also made a bad twin arc welder operator received dissimilar treatment in that he was not fired, but returned to the "tool room".

The Court cannot accept plaintiff's contentions. To do so would require the improbable conclusion that the foreman and management of the plant had little more to do than conspire to destroy the plaintiff's career at Modern Welding. If such were their motive, it is unlikely that he would have been hired in the first place. To have done so would risk production time and expensive tanks, and Meese and his boss, Mr. Weaver, do not appear to be interested in such activities. It should be noted that production time is valuable in this business, and during plaintiff's employment the plant was operating two shifts.

It is curious and can be considered injurious to the defense that Modern Welding Company allowed plaintiff Melvin Johnson to progress as far as he did and to achieve the pay levels that he did. One such indication is not conclusive however. The decisions to advance the plaintiff may have been caused by poor judgment, his prior performance in lesser demanding fields, or the Peter Principle.[1] In any event, this fact alone and the rest of the plaintiff's case do

1. The theory expressed in a humorous book of the same title by Dr. Laurence J. Peter and Raymond Hull, William Morrow & Company, Inc., New York, 1969. The authors formulate the "Peter Principle" as:

In a Hierarchy Every Employee Tends to Rise to His Level of Incompetence

. . . .

The term "hierarchy" was originally used to describe the system of church government by priests graded into ranks. The contemporary meaning includes any organization whose members or employees are arranged in order of rank, grade or class. *Id.* at 25.

not establish that the defendant's actions, through its agents, toward the plaintiff were racially motivated.

It is not exactly clear why or when the decision was made to fire the plaintiff. It could stem from his performance as a tank tester or be solely due to his problems as a twin arc welder. It could be that the plaintiff did not get along well with his supervisor because of personality clashes. More likely, it was a combination of all such factors. In any event, the plaintiff was terminated from the employment of Modern Welding Company on February 26, 1979, because his work "was not up to standards."

Subsequently, the plaintiff has obtained other employment. He went back to work for Owens-Corning on March 14, 1979, and has been recently employed by DuPont on April 14, 1981. Plaintiff's brother is still regularly and satisfactorily employed at Modern Welding Company.

The foregoing findings of fact in narrative form have been made by the Court after a review of notes and certain portions of the testimony adduced at the trial. Unfortunately, the facts were not fully developed during the trial. There are some areas of uncertainty. However, both plaintiff and defendant have had their "day in court", and the Court must proceed, as best it can, upon the record. As it exists, the Court is unpersuaded that any action on the part of the defendant was racially motivated.

At the conclusion of the plaintiff's evidence, the defendant made a motion for directed verdict. The Court overruled this motion, opining at the time that the plaintiff had at least made out a prima facie case of discrimination under the guidelines of the opinion of the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

## CONCLUSIONS OF LAW

This case does not require lengthy commentary. The facts demand the legal conclusion. The Supreme Court provided an appropriate model of a prima facie Title VII case in *McDonnell Douglas*. At the conclusion of the plaintiff's evidence, in the opinion of the trial court, this plaintiff had shown (a) that he belongs to a racial minority; (b) that he (according to his testimony) was qualified for the job which he held, and performed it adequately; (c) that he was terminated; and (d) that he was replaced by a white employee. After the defendant presented its evidence, however, the significance of the replacement of this plaintiff with a white employee diminished considerably.

Some confusion has arisen as to the burdens upon the parties in Title VII cases as a result of the progeny of *McDonnell Douglas*. To clear up this confusion, the Supreme Court has spoken directly to the questions of the respective burdens which plaintiff and defendant bear in a Title VII case. *Texas Department of Community Affairs v. Burdine*, (1981) —— U.S. ——, 101 S.Ct. 1089, 67 L.Ed.2d 207.[2] In *Burdine* the Supreme Court restates and explains the language of the *McDonnell Douglas* opinion.

"The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all time with the plaintiff. (citations omitted) The *McDonnell Douglas* division of intermediate evidentiary burdens serves to bring the litigants and the Court expeditiously and fairly to this ultimate question." *Burdine*, p. 1093.

"Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee. If the trier of fact believes the plaintiff's evidence, and if the employer is

2. It should be noted that the *Burdine* case reversed a decision of the Fifth Circuit Court of Appeals [608 F.2d 563] which seemed to expand upon the defendant's burden in such cases.

silent in the face of the presumption, the Court must enter judgment for the plaintiff because no issue of fact remains in the case." *Burdine*, p. 1094.

"The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the Court that it was actually motivated by the proffered reasons." *Burdine*, p. 1094.

Most importantly, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff ... The plaintiff retains the burden of persuasion. *Burdine*, p. 1094.

Of course, if the defendant does "articulate" a legitimate, nondiscriminatory purpose, the plaintiff may offer evidence to show that the proffered explanation of the defendant is pretextual.

 In this case, the plaintiff has failed in his very necessary burden to show the Court that the defendant's actions were racially motivated. The employer's burden is satisfied if it simply explains what it did or produces evidence of legitimate nondiscriminatory reasons. Such an explanation or production of evidence will absolve the employer of liability if the Court finds, and believes, that the plaintiff has failed in his continuing burden of proving by a preponderance of the evidence that the defendant discriminated against him on the basis of his race. Here, while the plaintiff did initially make out a prima facie case under the criteria announced in *McDonnell Douglas* as explained by *Burdine*, the plaintiff failed in his ultimate burden of proof and persuasion. The defendant has articulated a legitimate, nondiscriminatory reason for firing the plaintiff. While the trier of fact is more inclined to accept the employer's proffered reasons for the termination, the result would be the same if the Court were equally divided in credence to the position of both the plaintiff and the defendant. Ambivalence would be the clearest indication that the plaintiff has failed in his burden of proof and persuasion.

The Court is not convinced that it is more likely so than not so that the defendant discriminated against the plaintiff. Accordingly, the District Judge, sitting in this case without a jury, finds for the defendant.

ORDER

Upon the foregoing findings of fact and conclusions of law, it is hereby ordered that the plaintiff's case shall be dismissed and that judgment shall be entered in favor of the Defendant. Each party shall bear his own costs.